John F. RAUCH, Administrator of the
Estate of Bonnie J. Rauch,
Deceased, Appellant

v.

Henrik MIKE–MAYER, M.D., Michael Clark, M.D., Michael Feffer, M.D., Mercy Anesthesia Group, P.C., Mercy Regional Health System, Mercy Hospital of Altoona t/d/b/a Mercy Regional Health System and David J. Davies, Individually and t/d/b/a Mercy Regional Health System, Appellees.

Superior Court of Pennsylvania.

Argued May 1, 2001.

Filed Sept. 11, 2001.

Letta Crabtree, Pittsburgh, for appellant.

Allen P. Neely, State College, for Feffer, Clark and Mercy Anesthesia, appellees.

Karen Grabill, Altoona, for Mercy Hosp. of Altoona, appellee.

Before: HUDOCK, ORIE MELVIN and POPOVICH, JJ.

HUDOCK, J.:

¶ 1 This is an appeal from a final order granting summary judgment as to all claims and all parties in a medical malpractice case. *See Ney v. Axelrod*, 723 A.2d 719, 720 n. 1 (Pa.Super.1999) (order that disposes of all claims and all parties is final and appealable). We reverse and remand for further proceedings consistent with this opinion.

¶ 2 In December of 1994, Bonnie J. Rauch fell and severely injured her elbow. She was examined at the Emergency Department of Appellee Mercy Regional Health System and diagnosed with a fractured olecranon process. Subsequently, Mrs. Rauch was referred to Appellee Henrik Mike–Mayer, M.D., an orthopedic surgeon. Dr. Mike–Mayer examined Mrs. Rauch on December 19, 1994, and scheduled her for corrective surgery the next day. During his examination of Mrs. Rauch, Dr. Mike–Mayer noted a past medical history of hypertension, diabetes mellitus, two myocardial infarctions with quadruple bypass surgery and a cerebrovascular accident affecting her left side.

Dr. Mike–Mayer also documented that Mrs. Rauch was on several medications including Lasix (a diuretic), Vasotec (for treatment of hypertension and symptomatic congestive heart failure), Klotrix (potassium supplement), and Glyburide (for the treatment of hyperglycemia re-

lated to diabetes). Dr. Mike–Mayer also noted that Mrs. Rauch smoked an average of one pack of cigarettes per day.

Pre-operative studies performed on December 19, 1994 included a chest x-ray and EKG; the results of both studies were abnormal. The chest x-ray revealed upper-lobe vascular prominence suggestive of congestive heart failure. The EKG revealed Q waves and a prolonged QT interval which can be indicative of ischemic heart disease. In addition to these findings, the nurses' notes indicate that they had difficulty removing a ring from Mrs. Rauch's left hand, indicating that she may have had some edema. Edema can be caused by congestive heart failure.

Mrs. Rauch was also seen by [Appellee Michael Clark, M.D.] on December 19, 1994. Dr. Clark noted that Mrs. Rauch occasionally complained of chest pain and had a history of myocardial infarction, stroke, hypertension and diabetes. He further documented that general and regional anesthesia were explained to Mrs. Rauch and that she requested general anesthesia. He assigned her a "physical status [III]" which is defined by the American Society of Anesthesiologists as a patient with rather severe systemic disturbance or pathology.

Although Mrs. Rauch was evaluated by Dr. Clark on December 19, 1994, anesthesia was administered by [Appellee Michael Feffer, M.D.] .[1] Anesthesia was initiated at 10:55 a.m. and completed by 12:30 p.m. Upon completion of anesthesia, Mrs. Rauch was transferred to the post anesthesia care unit. At the time of transfer, Mrs. Rauch's vital signs were as follows: blood pressure, 224/129; pulse, 115; respirations, 20; temperature, 95.7. She was receiving oxygen at 10 liters via face mask.

At 12:40 p.m., Mrs. Rauch's blood pressure was 230/120 and she was placed on a 100% oxygen non-rebreathing mask. At 12:42 p.m. 10 mg of Normodyne was given and at 12:48 p.m. Dr. Feffer administered 30 mg of Edrophoniam and 0.4 mg of Atropine. At 1:00 p.m., the nurses' notes reflect that Mrs. Rauch was giving inappropriate responses, that she was biting down on the suction device and that she was coughing up thick mucous.

Mrs. Rauch was intubated by Dr. Feffer at 1:40 p.m. and Dr. Begley[2] was notified of her condition at 2:10 p.m. Dr. Begley examined Mrs. Rauch in PACU at 2:15 p.m. A chest x-ray revealed diffuse changes of pulmonary edema including vascular interstitial alveolar lung water accumulation. She was discharged from PACU to ICU at 2:50 p.m. with a diagnosis of cardiopulmonary failure and diffuse cardiogenic pulmonary edema and probable stroke. CT scans later revealed that she had suffered a stroke. She expired on December 28, 1994 due to complications of that stroke.

Trial Court Opinion, 10/12/00, at 2–4.

¶ 3 On December 13, 1996, Appellant John F. Rauch filed a complaint against Doctors Mike–Mayer, Clark and Feffer, as well as against the Mercy Anesthesia Group, P.C., David J. Davies, Mercy Regional Health System, and Mercy Hospital of Altoona (under that name and two additional "trade" names). The complaint alleged negligence by all defendants. Addi-

---

1. Both Doctors Clark and Feffer are members of Mercy Anesthesia Group, P.C., one of the named defendants in this case.

2. Dr. Begley was Mrs. Rauch's family physician. He was not named as a defendant in Appellant's complaint and is not a party to the present appeal.

tionally, Appellant raised allegations of corporate liability and vicarious liability against the Hospital. The matter proceeded through discovery until June of 1999, at which time Appellees filed motions to compel expert reports. Appellant provided expert reports in October of 1999 by James R. Merikangas, M.D., a neurologist and psychiatrist, and by Martha Gramlich, M.D., an internist and emergency physician.

¶ 4 In June and August of 2000, Appellees filed motions for summary judgment alleging that the expert reports provided an insufficient basis upon which to predicate a *prima facie* case. The motions for summary judgment also challenged the identified experts as unqualified to give such opinions. On October 12, 2000, the trial court granted summary judgment and dismissed all claims against all parties. Appellant's timely appeal followed on October 27, 2000. Appellant presents five issues for our consideration:

I. WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN [APPELLANT] HAD PRODUCED EVIDENCE THROUGH EXPERT REPORTS SUFFICIENT TO SET FORTH A PRIMA FACIE CASE OF MEDICAL NEGLIGENCE AS TO DR. MIKE–MAYER, DR. CLARK AND DR. FEFFER.

II. WHETHER THE TRIAL COURT ERRED IN PREMATURELY GRANTING SUMMARY JUDGMENT AS TO ALL DEFENDANTS WHEN DISCOVERY WAS ONGOING AND [APPELLANT] SHOULD HAVE BEEN PERMITTED TO SUPPLEMENT HIS EXPERT REPORTS UPON COMPLETION OF THE RELEVANT DISCOVERY IN AN ATTEMPT TO CURE ANY DEFECTS.

III. WHETHER [APPELLANT'S] EXPERTS, AN INTERNIST AND A NEUROLOGIST, ARE QUALIFIED TO RENDER OPINIONS AS TO THE CONDUCT OF THE DEFENDANT PHYSICIANS, AN ORTHOPEDIC SURGEON AND TWO ANESTHESIOLOGISTS.

IV. WHETHER THE TRIAL COURT ERRED IN FINDING THAT [APPELLANT'S] EXPERT REPORTS COULD NOT SUBSTANTIATE A CLAIM FOR VICARIOUS LIABILITY AGAINST THE DEFENDANT HOSPITAL.

V. WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO [APPELLANT'S] CLAIM OF CORPORATE NEGLIGENCE WHEN THE EXPERT REPORTS AS PROVIDED SUPPORT A PRIMA FACIE CASE OF CORPORATE NEGLIGENCE.

Appellant's Brief at 3.[3] Before considering the other claims, we shall first address Appellant's third argument. The question of whether the physicians who provided the expert reports in this case were qualified to do so is a threshold inquiry that

---

**3.** The certified record contains no order directing Appellant to file a concise statement pursuant to Rule of Appellate Procedure 1925(b). Thus, the waiver rule established by our Supreme Court predicated on the absence of a 1925(b) statement does not apply in this case. *See Commonwealth v. Lord,* 553 Pa. 415, 420, 719 A.2d 306, 309 (1998) (in all appeals filed after October 28, 1998, if the trial court orders the appellant to file a concise statement, any issue not clearly identified therein must be deemed waived).

must be resolved before proceeding with our analysis.

¶ 5 As an initial matter, we note that Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Capek v. Devito*, 564 Pa. 267, 270 n. 1, 767 A.2d 1047, 1048 n. 1 (2001). The moving party has the burden of proving that no genuine issues of material fact exist. *Rush v. Philadelphia Newspapers, Inc.*, 732 A.2d 648, 650 (Pa.Super.1999). In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. *Potter v. Herman*, 762 A.2d 1116, 1117–18 (Pa.Super.2000). Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *Id.* at 1117. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. *Basile v. H & R Block, Inc.*, 563 Pa. 359, 365, 761 A.2d 1115, 1118 (2000).

¶ 6 On appeal from a grant of summary judgment, a reviewing court must examine the record in a light most favorable to the nonmoving party. *Potter*, 762 A.2d at 1118. With regard to questions of law, an appellate court's scope of review is plenary. *Capek*, 564 Pa. at 270 n. 1, 767 A.2d at 1048 n. 1. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law

or abused its discretion. *Potter, supra.* Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration. *Lachat v. Hinchliffe*, 769 A.2d 481, 487 (Pa.Super.2001).

¶ 7 It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. *Von Der Stuck v. APCO Concrete, Inc.*, 2001 PA Super 187, 779 A.2d 570 (2001). The test to be applied when qualifying an expert witness is whether the witness had any reasonable pretension to specialized knowledge on the subject under investigation. *Id.* If he or she does, then he or she may testify and the weight to be given such testimony is for the trier of fact to determine. *Id. Accord Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 480–81, 664 A.2d 525, 528 (1995). In the field of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. *Bindschusz v. Phillips*, 771 A.2d 803, 808–09 (Pa.Super.2001). Different doctors will have different qualifications. *Id.* at 809. Some doctors will be more qualified than others to provide evidence about specific medical practices. *Id.* However, it is for the jury to determine the weight to be given to expert testimony in light of the qualifications presented by the witness. *Id.*

¶ 8 The expert reports in this case were both provided by medical doctors. James R. Merikangas, M.D., represents that he is certified in Neurology by the American Board of Psychiatry and Neurology. *See* Expert Report of James R. Merikangas, M.D., 10/15/99, at 2. Appellees do not dispute that Dr. Merikangas has been board certified as a neurologist. However, Appellees do contend that Dr. Merikangas has devoted his time over the last decade to the practice of psychiatry and not neurology. Such a contention goes to the

degree of trust to be placed in Dr. Merikangas' testimony, but not to the question of whether he is a qualified medical expert. *See* footnote 6, *infra.*

¶ 9 Appellant also proffered an expert report from Martha Gramlich, M.D. Dr. Gramlich is certified in emergency medicine by the American Board of Emergency Medicine. She is also certified in internal medicine by the American Board of Internal Medicine. Appellees do not dispute these points.

¶ 10 The autopsy performed on Mrs. Rauch indicates that she died of a stroke.[4] We are unaware of any reason that would preclude the causes of stroke from being matter within the cognizance of any medical doctor. Certainly, board certified physicians with specialties in neurology, emergency medicine and internal medicine would be familiar with, and qualified to express opinions upon, the physiological conditions leading to circulatory distress, ischemia, resulting neurological breakdown, and stroke. We can see no reason to preclude the reports of Dr. Merikangas or Dr. Gramlich on the grounds that either physician was unqualified to offer an expert opinion as to the cause of Mrs. Rauch's death. Furthermore, no matter of record indicates that these physicians were unqualified to express an expert medical opinion concerning the standards pertinent to the treatment of a patient in Mrs. Rauch's condition at the time prior to her demise.[5]

■ ¶ 11 Our standard of review requires us to view the record in favor of the non-moving party. *Potter,* 762 A.2d at 1117. To the extent that any bona fide question exists as to the qualification of Dr. Merikangas and Dr. Gramlich to speak as physician experts, we must resolve that question in Appellant's favor at this stage

---

4. A stroke is a "sudden loss of brain function caused by a blockage or rupture of a blood vessel to the brain, characterized by loss of muscular control, diminution or loss of sensation or consciousness, dizziness, slurred speech, or other symptoms that vary with the extent and severity of the damage to the brain." The American Heritage Dictionary of the English Language (4th ed. 2000), *available at* Dictionary.com, "stroke," *at* http://www.dictionary.com/cgi-bin/dict.pl?term=stroke (last visited August 6, 2001). A "neurologist" is a physician who specializes in the diagnosis and treatment of disorders of the nervous system. MedicineNet.com, "neurologist," *at* http://www.medterms.com/script/main/art.asp?articlekey=4553 (last visited August 6, 2001). Neurologists frequently assist in the diagnosis and management of stroke victims. *See* MedicineNet.com, "How is a stroke diagnosed?", *at* http://www.focusonhighbloodp ressure.com/script/main/art.asp?li=MNI & ArticleKey=489 & page=4# tocgs. As noted, Dr. Merikangas is a neurologist. An "internist" is a physician who specializes in the diagnosis and medical treatment of adults. MedicineNet.com, "internist," *at* http://www.medterms.com/script/main/art.asp?ar-

ticlekey=3997 (last visited August 6, 2001). Stroke, a medical condition affecting adults, certainly falls within the purview of internal medicine. Dr. Gramlich is an internist. Furthermore, a stroke is a medical emergency. "How is a stroke diagnosed?", *supra.* Patients are advised to seek emergency medical assistance immediately upon the onset of symptoms of stroke. *Id.* In addition to her board certification in internal medicine, Dr. Gramlich also is board certified in emergency medicine.

5. The trial court opinion states that, because Dr. Gramlich indicated that further opinions by an orthopedist, a neurologist, and an anesthesiologist would be useful, Dr. Gramlich in essence conceded that she is unqualified to render an expert opinion in this case. Trial Court Opinion, 10/12/00, at 9. This is a misreading of Dr. Gramlich's statement, which was that additional expert opinions would "clarify further" the events of this case. Expert Report of Martha Gramlich, M.D., 7/29/99, at 2. The fact that Dr. Gramlich concluded that other opinions might be useful does not negate her own qualifications, nor does it nullify her conclusions.

of the proceedings. *Id. See Potter*, 762 A.2d at 1117 (all doubts must be resolved against the moving party). We therefore accept the expert reports proffered in this case as having been provided by qualified expert witnesses.[6] We therefore shall proceed to consider the merits of Appellant's argument that the trial court erred in granting summary judgment on the medical malpractice and corporate negligence claims.

¶ 12 In the present case, the trial court concluded that the expert reports Appellant provided were insufficient to make out a *prima facie* case of negligence against the physician defendants predicated on medical malpractice or against the institutional defendant based on the theory of corporate negligence. Thus, the trial court granted summary judgment premised on Appellant's alleged failure to provide an expert report adequate to sustain a cause of action sounding in medical malpractice or corporate negligence. Appellant's first, fourth and fifth claims are that the trial court committed both an error of law and an abuse of discretion in reaching this conclusion with regard to the expert reports.[7]

¶ 13 To review the propriety of the trial court's ruling, we look initially to the procedural rules that govern the matter. When the order at issue has been entered to address a substantive deficiency in proof in the cause of action, the trial court's action properly is subject to review under Rule of Civil Procedure 1035.2 and the cases interpreting that rule. *Miller v. Sacred Heart Hospital*, 753 A.2d 829, 833 (Pa.Super.2000). The Rule establishes two bases on which summary judgment may be granted:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. Accordingly, a proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or

---

6. When a matter goes to trial, the specific training and experience of a potential expert witness can be explored on the record so that the trial court may ascertain whether that witness qualifies as an expert in the field at issue. *See Rittenhouse v. Hanks*, 2001 PA Super 153, 777 A.2d 1113 (2001) (qualification of expert witness at trial rests within the sound discretion of the trial judge). This also provides the jury with a basis on which to determine the expert's credibility. In the present case, the matter has not yet gone to trial. Therefore, the correct opportunity for the trial court to evaluate fully the training and experience of Dr. Merikangas and Dr. Gramlich has not yet arisen. *See Resolution Trust Corp. v. Urban Redevelopment Authority*, 536 Pa. 219, 225, 638 A.2d 972, 975 (1994) (credibility of evidence is not a proper consideration at the summary judgment stage).

7. Although Appellant has raised these questions as Issues I, IV and V, we find it more logical to ascertain whether a *prima facie* case has been established under all theories of liability before proceeding to consider the other claims presented in this appeal.

defense. *Basile v. H & R Block, Inc.*, 2001 PA Super 136, 777 A.2d 95 (2001).

■ ¶ 14 Under Rule 1035.2(2), if a defendant is the moving party, he may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of his cause of action. *Id.* Correspondingly, the non-moving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party. *Id.* When the plaintiff is the non-moving party, "summary judgment is improper if the evidence, viewed favorably to the plaintiff, would justify recovery under the theory [he] has pled." *Id.* In the present case, the defendants (Appellees) are the moving parties, and the plaintiff (Appellant) is the non-moving party. Because the trial court at least impliedly premised its order on Rule 1035.2(2), we must discern, in the first instance, whether the court committed an error of law in determining and applying the legal standard for medical malpractice and/or the doctrine of corporate liability. *See id.* (appellate court's first task in considering summary judgment granted under Rule 1035.2(2) is to determine whether the trial court applied the correct legal standard).

■ ¶ 15 To sustain a cause of action for medical malpractice, a plaintiff must establish the following five elements: (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm. Moreover, the patient must offer an expert witness who will testify to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.

*Wolloch v. Aiken*, 756 A.2d 5, 14–15 (Pa.Super.2000).[8] *Compare Hightower–Warren v. Silk*, 548 Pa. 459, 463 n. 1, 698 A.2d 52, 54 n. 1 (1997) (expert medical testimony is not required if a matter is so simple or the lack of skill or care is so obvious as to be within a lay person's range of experience and comprehension).

■ ¶ 16 As already noted, in the present case, Appellant presented two expert reports, one prepared by James R. Merikangas, M.D., and one prepared by Martha Gramlich, M.D. After summarizing the medical facts that led to the death of Mrs. Rauch, Doctor Merikangas stated, in pertinent part,

Given her history of atherosclerosis, myocardial infarction, cardiomegaly, hypertension, diabetes mellitus and a prior stroke in addition to her history of heavy smoking, her anesthesia and surgery were high risk procedures. Her pre-op chest x-ray suggested congestive

---

**8.** As a general matter, a viable cause of action sounding in negligence must demonstrate only four elements: (1) a duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risks; (2) failure on the part of the defendant to conform to that standard of conduct, *i.e.*, a breach of duty; (3) a reasonably close causal connection between the breach of duty and the injury sustained; and (4) actual loss or damages that result from the breach. *Ney*, 723 A.2d at 721. The mere fact that an accident has occurred does not entitle the injured person to a verdict. *Id.* A plaintiff must show that the defendant owed a duty of care, and that this duty was breached. *Id.*

heart failure and she had an abnormal electrocardiogram.

Surgery and anesthesia in a woman this medically compromised, to a reasonable degree of medical certainty, caused her death.

The stroke was the result of the massive changes in the metabolic status of Mrs. Rauch including her blood pressure ranging from 98/55 with a pulse of 55 to 224/129 with a pulse of 115 with cardiopulmonary failure and diffuse cardiogenic pulmonary edema.

The anesthesiologist PACU post-op record indicates that at 13:45 on 12/20/94 when the patient was extubated she was noted to be lethargic with diminished respiratory excursions. Her blood pressure was 230/129 and she subsequently became increasingly lethargic despite various medications including Tensilon, Labetolol, Naloxone and 100 percent oxygen by mask. Dr. Begley's records of 12/20/94 indicated that post-operatively "She was near death with cardiopulmonary failure[."] The neurological report by Dr. Lukacs of 12/22/94 indicated that she had an old middle right cerebral artery infarction seen on CT scan on 12/20. A follow up study showed a new ischemic infarction on the left side with edema and mass effect.

To perform surgery on this woman's elbow with general anesthesia constitutes reckless disregard for her welfare and this deviation from the standard of care was the proximate cause of her cerebrovascular accident. The cerebrovascular accident was the cause of her death (death certificate of December 29, 1994).

The autopsy of 12/28/94 confirmed this opinion showing that the basilar artery was almost totally obstructed by large atheromatous plaques and recent thrombi with infarction of much of the left hemisphere of the cerebral and cerebellar peduncles, the basal ganglia, brain stem and extending into the cerebellum. It is noted that there was extensive arteriolar atherosclerosis and hyalinization of the kidneys, mild emphysema, fibrosis and acute and chronic bronchitis of the lungs, severe arteriosclerosis of the heart and almost total occlusion of many of the coronary branches with areas of old infarction and fibrosis along the septum and the inferior apical areas as well as hypertrophy of the left ventricle and an aneurysm of the aorta. The summary of the autopsy is that "Following surgery for open repair of a fractured elbow the patient suffered a massive cerebrovascular accident with resultant infarction of most of the left hemisphere of the brain including a portion of the bran stem, cerebellum and basal ganglia area[."]

Expert Report of James R. Merikangas, M.D., 10/15/99, at 1–2.

¶ 17 Dr. Merikangas clearly stated that, to a reasonable degree of medical certainty, the ischemic event that caused Mrs. Rauch's death was precipitated by the anesthesia administered to her and the surgery performed upon her. The expert report does not explicitly state that the physicians involved "deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *See Wolloch, supra* (explaining elements of medical malpractice). However, Dr. Merikangas did state that the admission of general anesthesia to a woman as "medically compromised" as was Mrs. Rauch comprised a "deviation from the standard of care" that constituted "reckless disregard" for the patient's welfare under the medical circumstances of this case.

¶ 18 In essence, it is Dr. Merikangas' expert opinion that Mrs. Rauch was not a candidate for general anesthesia in an operation that merely pertained to her elbow, and that the physicians responsible for recommending general anesthesia and administering it to the patient acted in reckless disregard of her welfare. Furthermore, Dr. Merikangas states that it is his expert opinion, confirmed by the autopsy, that Mrs. Rauch died of a stroke that was caused by the surgery and the anesthesia. We conclude that Dr. Merikangas' phrasing, while it does not track the language of *Wolloch*, nevertheless reasonably satisfies the requirements of that decision concerning the plaintiff's obligation to provide an expert report stating that the acts of the physicians deviated from good and acceptable medical standards and that the deviation was the proximate cause of the harm suffered.

¶ 19 Dr. Gramlich was unequivocal in her opinion that the treating physicians had options other than general anesthesia. First, Dr. Gramlich characterized Mrs. Rauch as a "very high risk patient." Expert Report of Martha Gramlich, M.D., 7/29/99, at 1. She further stated that general anesthesia was used even though regional anesthesia was an option. *Id.* Dr. Gramlich additionally stated that the option to forgo the surgery existed. *Id.*[9] Her report unequivocally indicates her conclusion that the treating physicians provided substandard care to Mrs. Rauch. *Id.* at 2.

¶ 20 When Dr. Merikangas' report is coupled with Dr. Gramlich's report, it is clear that Appellant has provided adequate expert opinion to make out a *prima facie* case of medical malpractice against all of the physician defendants. The trial court appears to have premised the grant of summary judgment in favor of the physician defendants, at least in part, on the fact that the expert reports do not attribute fault to each physician by name. We have considered the expert reports carefully and conclude that both clearly indicate that the anesthesiologists and surgeons who worked on Mrs. Rauch deviated from acceptable medical standards in a manner that proximately caused their patient's death.

¶ 21 An expert's report is not required to contain "magic words." *Welsh v. Bulger*, 548 Pa. 504, 514, 698 A.2d 581, 585–86 (1997). The courts of Pennsylvania look at the substance of the evidence presented. *Id.*, 548 Pa. at 514, 698 A.2d at 586. Thus, there was no need for the expert reports proffered in this case to contain a formulaic incantation of identification and fault attribution. The clear import of the reports implicates the named physician defendants. This is sufficient.

¶ 22 Pennsylvania recognizes the doctrine of corporate negligence as a basis for hospital liability separate from the liability of the practitioners who actually have rendered medical care to a patient. *Whittington v. Episcopal Hospital* 768 A.2d 1144, 1149 (Pa.Super.2001). The doctrine creates a non-delegable duty on a hospital to uphold a proper standard of care to patients. *Id.* Our law will impose liability if the hospital fails to ensure a patient's safety and well being at the hospital. *Id.* A hospital is directly liable under the doctrine of corporate negligence if it fails to uphold any *one* of the following four duties:

1. a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

---

9. Dr. Gramlich's expert report does not specify the alternative options to surgery that were available to the treating physicians.

2. a duty to select and retain only competent physicians;

3. a duty to oversee all persons who practice medicine within its walls as to patient care; and

4. a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id.* (quoting *Thompson v. Nason Hospital* 527 Pa. 330, 339–40, 591 A.2d 703, 707–08 (1991)). Furthermore, to present a *prima facie* case of corporate negligence, a plaintiff must demonstrate **all** of the following elements:

1. [the hospital] acted in deviation from the standard of care;

2. [the hospital] had actual or constructive notice of the defects or procedures which created the harm; and

3. that the conduct was a substantial factor in bringing about the harm.

*Id.* Unless a hospital's negligence is obvious, an expert witness is required to establish two of the three prongs: that the hospital deviated from the standard of care and that the deviation was a substantial factor in bringing about the harm. *Id.,* 768 A.2d at 1149–50.

▇▇▇▇ ¶ 23 The duty to uphold the proper standard of care runs directly from the hospital to the patient. *Welsh,* 548 Pa. at 513, 698 A.2d at 585. Therefore, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action for corporate negligence. *Id.* Corporate negligence is based on the negligent acts of the institution itself. *Id.* "A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees." *Id.* Thus, a corporation is held directly liable, as opposed to being vicariously liable, for its own negligent acts. *Id.*

¶ 24 Our Supreme Court has explained the type of evidence necessary to establish corporate negligence sufficiently to survive a motion for summary judgment. *Id.* It is not necessary for the experts' reports to contain "magic words" or to set forth their opinions in any specific manner. *Id.* at 514, 698 A.2d at 585–86. Dr. Gramlich stated the following with regard to the corporate negligence claim:

Despite multiple risk factors, a very high risk patient, a positive xray [sic] and abnormal labs, no medical clearance was obtained for optimization of blood pressure control, correction or evaluation of possible CHF and renal flow. General anesthesia was used when regional anesthesia or no surgery were options.

Expert Report of Martha Gramlich, M.D., 7/29/99, at 1. Dr. Gramlich further stated:

The standard of care from my experience as both an E.R. doctor and internist required medical clearance. It was substandard to perform general anesthesia on this patient without medical clearance. All breaches of the standard of care expose the patient to increased risk of harm. In this patient the 20–30 minute sustained hypotension and congestive heart failure precipitated the stroke which resulted in this patient's death. The risk to this patient would have been significantly reduced by medical clearance and optimization of blood pressure and cardiac function as well as by regional anesthesia.

*Id.* at 2.

▇▇▇ ¶ 25 A fair reading of Dr. Gramlich's expert report indicates that her criticism of the care rendered to Mrs. Rauch goes to the duty of a hospital to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients. Dr. Gramlich explained that, in her expert opinion, administering general anesthesia

to Mrs. Rauch without medical clearance was a "substandard" deviation from the proper standard of care. *Id.* Furthermore, Dr. Gramlich stated that this conduct exposed Mrs. Rauch to increased risk of harm, and that the patient's risk would have been reduced to a significant degree had the anesthesiologists and the surgeon obtained proper medical clearance. *Id.* *See Montgomery v. South Philadelphia Medical Group, Inc.,* 441 Pa.Super. 146, 656 A.2d 1385, 1391 (1995) (when the medical expert demonstrates, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, it is then up to a jury to decide whether that conduct was a substantial factor in bringing about the harm). The information contained in Dr. Gramlich's report, coupled with that provided by Dr. Merikangas, indicates that the surgical and anesthesiological strategies followed in this case, to a reasonable degree of medical certainty, caused Mrs. Rauch's death. Expert Report of Martha Gramlich, M.D., 7/29/99, at 2; Expert Report of James R. Merikangas, 10/15/99, at 1. Thus, the expert reports suffice to satisfy the first and the third elements of the test set forth in *Whittington, supra.* This was all that is required of the expert reports. *See Welsh,* 548 Pa. at 514, 698 A.2d at 585 (unless the hospital's negligence is obvious, a plaintiff must produce expert testimony only to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm suffered).

¶ 26 It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. *Welsh,* 548 Pa. at 514 n. 13, 698 A.2d at 586 n. 13 (quoting *Thompson,* 527 Pa. at 342–43, 591 A.2d at 709). If the attending physician fails to act in accordance with standard medical practice, it is incumbent upon the hospital staff to so advise hospital authorities in order that appropriate action might be taken. *Id.* A hospital is properly charged with constructive notice when it "should have known" of the patient's condition. *Whittington,* 768 A.2d at 1154. Furthermore, constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. *Id.* We interpret "failure to enforce adequate rules and policies" as an analog to "failure to provide adequate supervision."

¶ 27 In the present case, it is unclear whether there were no proper standards in place for medical clearance, or whether the physician defendants failed to conform with the clearance procedures established by the institutional defendant. In either event, the institutional defendant failed to enforce adequate rules and policies so as to ensure quality care for its patients. Thus, we conclude that the institutional defendant in this case must be deemed to have received constructive notice of Mrs. Rauch's condition and the negative implications of the surgical and anesthesiological choices made in her case. We therefore conclude that Appellant sufficiently supported his claim of corporate negligence so as to survive Appellees' motion for summary judgment.[10]

---

10. As noted previously, a hospital is directly liable under the doctrine of corporate negligence if it fails to uphold a single one of the duties established by our Supreme Court in *Thompson. See Whittington,* 768 A.2d at 1149. Having determined that the expert reports support the conclusion that the hospital breached one duty, we need not engage in an analysis of whether Appellant established additional breaches of duty. *Id.* Thus, it is unnecessary to consider the additional theories of recovery against the institutional defendant contained in Appellant's complaint.

¶ 28 Appellant's next claim is that summary judgment was inappropriate because discovery was still ongoing, and he should have been permitted to supplement his expert report. As we have concluded that the expert reports already filed in this case were adequate to survive a motion for summary judgment, we need not address the merits of this claim. We note, however, that the trial court properly considered the motions for summary judgment in this case. The discovery relevant to the specific motion was complete in that the parties had agreed upon a deadline for the production of expert reports, and that deadline was past. Thus, it was not improper for Appellees to seek summary judgment in conformity with Rule 1035.2(2) predicated on allegedly inadequate expert reports. Whether discovery as to the production of expert reports is complete is a different question from whether all discovery in the case has been completed. Indeed, Appellant indicates that the defendant anesthesiologists have not yet been deposed. In conformity with the relevant Pennsylvania Rules of Civil Procedure, Appellant will have the opportunity to complete discovery upon remand.

¶ 29 We reverse the order granting summary judgment and remand the matter to the trial court for further proceedings consistent with this opinion. Jurisdiction relinquished.