J-A20010-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOSEPH S. DRUSKO, PERSONAL REPRESENTATIVE OF THE ESTATE OF CATHY A. DRUSKO | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| UPMC NORTHWEST, UPMC HEALTH SYSTEM, NORTHWEST EMERGENCY PHYSICIANS, LLP, DAVID FERRARO, M.D., UPMC NORTHEAST SURGICAL ASSOCIATES, DANIEL J. LOVESTRAND, M.D., AND UPMC NORTHWEST ANESTHESIA, INC. | |
| | No. 1144 WDA 2015 |

Appeal from the Judgment Entered August 24, 2015
In the Court of Common Pleas of Venango County
Civil Division at No(s): 701-2011

BEFORE:  BOWES, STABILE AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED March 1, 2017**

This is an appeal from the August 24, 2015 judgment entered in favor

of Daniel J. Lovestrand, M.D., in a medical malpractice action filed by Joseph

S. Drusko, Personal Representative of the Estate of Cathy A. Drusko, his late

wife, seeking wrongful death and survival act damages.[1]  Mr. Drusko alleges that the trial court erred in putting a settling defendant, UPMC-Northwest ("the Hospital"), on the verdict slip.  After thorough review, we affirm.

The facts giving rise to the within action are as follows.  Mid-morning on October 1, 2009, fifty-three-year-old Cathy Drusko presented to the emergency room of UPMC Northwest with complaints of abdominal pain and vomiting for three days.  She provided a medical history that included three prior abdominal surgeries, hypertension, smoking, hypercholesterolemia, obesity, a 2007 bout of chest pain, and a family history of heart disease.  Based on his examination and the patient's history, emergency room physician, Jeffrey Corsetti, M.D., suspected a bowel obstruction and ordered abdominal x-rays for confirmation.  When the findings on x-ray were consistent with that condition, Ms. Drusko was admitted to the Hospital under the care of Daniel Lovestrand, M.D., a member of her primary care practice group.

A surgical consult was obtained from David Ferraro, M.D.  His examination revealed a soft non-distended abdomen, tender in all four quadrants, but no signs of peritoneal involvement.  Based on his examination and Ms. Drusko's history of hysterectomy, appendectomy and

_____

[1] Appellant purported to appeal from the order denying post-trial motions. The appeal lies from the judgment entered on the verdict on August 24, 2015.  We have amended the caption accordingly.

cholecystectomy, his noted impression was partial small bowel obstruction or an ileus secondary to a virus. His plan was to treat conservatively with intravenous fluids and nasogastric suction, follow-up with serial exams, and if there was no improvement, entertain the possibility of an exploratory laparotomy.

By the next morning, although examination revealed some improvement, Dr. Ferraro opted for exploratory laparotomy surgery. Dr. Lovestrand ordered a preoperative EKG, which he read as showing sinus bradycardia, some mild T-wave abnormalities, but no evidence of ischemia. The surgery proceeded without complications. Two days later, Ms. Drusko complained of pain that was charted as epigastric pain. Six hours later, she was found unresponsive in her room. A code blue was called, CPR was initiated, and following defibrillation, a bradycardic rhythm was achieved, and Ms. Drusko was moved to the ICU. After repeated episodes of ventricular fibrillation, she was transferred via life flight to UPMC Presbyterian Hospital. Emergency angioplasty was successful in opening up one of two occluded arteries, but she succumbed according to the death certificate due to cardiogenic shock, acute myocardial infarction, and coronary artery disease.

Mr. Drusko commenced this lawsuit against nine defendants. Liability against the Hospital was premised upon three legal theories: *respondeat superior* for the negligence of its nursing staff for failure to notify a physician

of Ms. Drusko's post-surgical epigastric pain and obtain an EKG; ostensible agency theory for the negligent conduct of its physicians; and corporate negligence based upon the Hospital's failure to adopt standards governing differential diagnosis of epigastric pain in the emergency room, for the overreading[2] of EKG's by cardiology, for review of prior EKG's, and regarding clearance for persons with abnormal pre-op EKG's. No crossclaims were filed. The Hospital and the other defendants, with the exception of Dr. Lovestrand, either settled or were voluntarily dismissed prior to trial.

The case proceeded to a jury trial solely against Dr. Lovestrand. It was the plaintiff's theory that the EKG ordered by Dr. Lovestrand revealed an ischemic condition and that he should have obtained a cardiology consult in light of Ms. Drusko's many cardiac risk factors. Had he done so, the Plaintiff maintained that either surgery would have been postponed, drugs could have been administered that would have reduced the risk of a cardiac event, or in any event, Ms. Drusko's heart would have been monitored during and after surgery, which would have resulted in the detection of the heart attack soon enough to successfully intervene. The defense maintained that Dr. Lovestrand read the EKG correctly, that it did not indicate cardiac

_____

[2] An over-read of an EKG is a second review and interpretation conducted by a specialist, usually a cardiologist, after an initial reading by a primary care physician, ER physician, or computer.

issues, and that the presence of a cardiologist would not have altered either her care or the outcome.

At jury selection, the trial court advised counsel that it was "going to treat it as though there were only the plaintiff Drusko and the defendant Lovestrand" in the case. However, after opening statements, the court and counsel discussed the proposed verdict slips and the defense's request that other defendants be placed on the verdict slip for purposes of apportioning negligence. The court agreed to wait until the close of the evidence before making its decision, but ultimately ruled that the Hospital would be included on the verdict slip based on evidence that the nurses were negligent in their failure to respond appropriately to the decedent's complaints of chest pain.

The jury returned a verdict finding Dr. Lovestrand negligent and the Hospital non-negligent.[3] However, it then concluded that Dr. Lovestrand's negligence did not increase the risk of harm to the decedent, resulting in a defense verdict. Mr. Drusko filed timely post-trial motions seeking a new trial, in which he alleged that the trial court erred in placing the Hospital on the verdict slip as there was no *prima facie* evidence of negligence against that entity and its inclusion confused the jury and led to an improper verdict.

---

[3] The verdict slip indicated that two jurors believed the Hospital was negligent, but all twelve jurors believed Dr. Lovestrand was negligent. However, only two of the jurors determined that Dr. Lovestrand's negligence caused or increased the risk of harm to Decedent.

The trial court denied post-trial relief, finding it was not error to include the Hospital on the verdict slip. Furthermore, the Plaintiff had not demonstrated any adverse effect from its inclusion as it did not reduce Plaintiff's verdict in any way. The Plaintiff appealed to this Court raising three issues:

> [1.] Did the trial court commit an error of law or otherwise abuse its discretion when it concluded that testimony from Doctor Traill and Dr. Stark was sufficient to constitute a prima facie case against the nursing staff of UPMC Northwest?
>
> [2.] Did the trial court abuse its discretion when it allowed a party that had been dismissed prior to trial to be included on the verdict slip where no other litigant had advanced a theory of liability against the dismissed party in any obligatory pre-trial expert report?
>
> [3.] Did the trial court apply the harmless error doctrine in a manner inconsistent with the decision in Deeds v. University of Pennsylvania Med. Ctr. when it failed to recognize that inclusion of UPMC Northwest on the verdict slip may have nevertheless influenced jury deliberations on the issues of liability and causation?

Appellant's brief at 3 (unnecessary capitalization omitted). Mr. Drusko's first two issues involve error in the inclusion of the Hospital on the verdict slip. His third issue challenges the trial court's conclusion that any error in this regard was harmless.

Our standard of review regarding a trial court's denial of a motion for a new trial is limited. "The power to grant a new trial lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law[,] which controls the outcome of the case." *Maya v. Johnson & Johnson & McNeil-PPC, Inc. (In re McNeill-PPC,*

***Inc.)***, 97 A.3d 1203, 1224 (Pa.Super. 2014). In conducting our review, we employ a two-part analysis. First, we determine if an error occurred. If so, we then ascertain "whether the error resulted in prejudice necessitating a new trial." ***Czimmer v. Janssen Pharms., Inc.***, 122 A.3d 1043, 1051 (Pa.Super. 2015). Under the second aspect of this test, the "consideration of all new trial claims is grounded firmly in the harmless error doctrine[.]" ***Knowles v. Levan***, 15 A.3d 504, 507 (Pa.Super. 2011). The error in question must have affected the verdict. ***Id.***

We review an alleged error in the trial court's decision regarding the inclusion or exclusion of a settling defendant on a verdict slip for an abuse of discretion or an error of law. ***Hyrcza v. West Penn Allegheny Health Sys.***, 978 A.2d 961, 968 (Pa.Super. 2009). "An abuse of discretion occurs when the course pursued by the trial court represents 'not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will.'" ***Id***. at 746.

In ***Hyrcza***, ***supra***, the trial court dismissed the settling defendants, the hospital and other physicians and their practices, and excluded them from trial and the jury verdict slip, based on a finding that the defense had failed to establish a *prima facie* case of medical malpractice against them. On appeal, the remaining defendants argued that this constituted error in light of clear evidence of the negligence of the hospital and other physicians.

- 7 -

Furthermore, they contended that the court's ruling denied them the right to have their liability apportioned among joint tortfeasors in accordance with the Uniform Contribution Among Joint Tortfeasor Act, 42 Pa.C.S. § 8321 *et seq*. We affirmed, citing **Herbert v. Parkview Hosp.**, 854 A.2d 1285 (Pa.Super. 2004), as defining the relevant inquiry: "whether the evidence adduced was sufficient to warrant the jury apportioning any liability to the settling defendants." **Id**. at 968. We concluded that, where the evidence did not present a *prima facie* case against the settling co-defendants, the co-defendant could be omitted from the verdict slip.

In **Herbert**, a medical malpractice case, the administratrix entered into a joint tortfeasor release settling her claims with the hospital and a treating physician and proceeded to trial against the defendant nephrologist.[4] Nonetheless, the court included the hospital and physician on the verdict slip, and the jury found all three negligent and allocated

_____

[4] The joint tortfeasor releases complied with the Uniform Contribution Among Tort-feasors Act ("UCTA"), which provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S. § 8326.

responsibility sixty percent to the hospital, thirty percent to treating physician, and ten percent to the nephrologist. Both the administratrix and the nephrologist appealed, and the administratrix alleged that it was error to include the settling hospital and treating physician on the verdict slip as there was no expert testimony that could support the apportionment of negligence against them.

We rejected the administratrix's contention that there was no expert testimony regarding the standard of care applicable to those settling defendants, breach of that standard, and causation of the harm. We found that the administratrix's expert testified "more than adequately to a standard of care that . . . cast an equally damning light on the performance of every physician who had a hand in treating Decedent" during the relevant period. *Id*. at 1290. The expert pointed to signs and symptoms of upper airway obstruction in the chart, some of which were noted by treating physician, which provided "enough evidence for anybody to suspect strongly that there was a blockage in the airway." *Id*. at 1291. We construed such testimony as sufficient to implicate substandard care by the settling defendants and support apportionment. Hence, we affirmed the trial court's inclusion of the settling co-defendants on the verdict slip and the jury's apportionment of liability.

Herein, prior to jury selection, the trial court advised the parties that it would treat the case as if it involved only Plaintiff Drusko and Defendant

Lovestrand "and take it from there." N.T. Vol. I, at 83. After opening statements, in conjunction with a discussion regarding the verdict slip and the treatment of the settling defendants, the court asked counsel for input regarding their preferences. Counsel for Plaintiff advised the court that he would be satisfied with that posture for the case. Further, given the fact that he did not intend to elicit any evidence against other defendants, and the defense had no experts who had rendered opinions in their reports that the other defendants were negligent and that their negligence caused or contributed to the injury, Plaintiff's counsel contended there was no basis upon which the jury could apportion negligence.

Defense counsel urged the court to defer ruling on the matter until the experts testified as it would be difficult for the experts to blame Dr. Lovestrand "without implicating at least Dr. Ferraro." *Id*. at 85. In addition, defense counsel maintained that Dr. Lovestrand was not involved in postoperative care, but the doctors who were involved were at least ostensible agents of the Hospital. Suggesting that there could be evidence presented that would support placing the Hospital and the practice groups on the verdict slip, defense counsel asked the trial court to reserve its ruling until the conclusion of the case. The court noted that the defense's emphasis in its opening statement on the fact that "the case was **just** against Dr. Lovestrand" was "getting close to being a tad unfair to [the

plaintiff]. *Id*. at 88 (emphasis supplied). Nonetheless, the court resolved to reconsider the issue later.

The court revisited the contents of the verdict slip at the close of testimony. At that time, Defense counsel asked only that the Hospital be placed on the slip, conceding that, "I don't think I have a sufficient foundation to ask for any other party to be on." N.T., Vol. 3, at 778. Plaintiff's counsel disputed that there was sufficient evidence against the Hospital to warrant its inclusion. The discussion of the Hospital's liability was premised on the conduct of the nurses. Plaintiff's counsel argued that testimony that nurses were "slow off the mark" or that one would expect nurses to call a doctor when certain complaints were voiced was not legally sufficient. N.T. Vol. 2, at 526.

The court disagreed. It pointed to defense expert Dr. Traill's criticism of the nurses, calling it "error" when "the nurse thought that this [pain] was not cardiac until the cardiac arrest." N.T. Vol. 2, at 552. Defense counsel added that Mr. Drusko's testimony that he and his wife complained of chest pain for six to eight hours, and the nurses did not respond or call a physician, together with Dr. Stark's testimony that prolonged complaints of chest pain should have prompted a response, warranted the Hospital being on the verdict slip for purposes of apportionment. Defense counsel also maintained that lay people could conclude whether complaints of chest pain

for six hours should have prompted a call to the doctor. The trial court ruled that the Hospital would be on the verdict slip.

In its Rule 1925(a) opinion, the trial court stated that it made its decision to include the Hospital on the verdict slip based mainly on defense expert Dr. Traill's reference to nursing "error" and his statement that, "people [were] a little slow off the mark in dealing with her myocardial infarction." Trial Court Opinion, 9/11/15, at 5; N.T. at 779. The trial court also pointed to the testimony of plaintiff's expert, Robert M. Stark, M.D., a physician board-certified in internal medicine and cardiology, to the effect that reports of chest pain to nurses should have prompted an immediate evaluation and a call to a physician, neither of which occurred.[5]

Mr. Drusko argues that Dr. Traill did not articulate the standard of care for the nurses, how it was breached, or how such a breach caused or contributed the decedent's fatal heart attack and death. Thus, he contends, his testimony was insufficient to make out a *prima facie* case of nursing negligence. Mr. Drusko cites ***Hyrcza*** for the proposition that in order for a settling defendant to be included on the verdict slip, "the evidence, when read in the light most favorable to the non-settling defendant, must establish a *prima facie* case of negligence against the settling defendant."

_____

[5] As Appellant correctly points out, the trial court erroneously attributed some opinion testimony provided by Dr. Finley W. Brown, Jr., M.D. to Dr. Robert Stark.

*Hyrcza*, *supra* at 969. Mr. Drusko maintains that expert testimony was required to make out a *prima facie* case of medical malpractice and that it was lacking herein.

In support of that position, Mr. Drusko maintains that the trial court misconstrued the thrust of Dr. Stark's testimony, and he urges us to view it in the context of the trial.[6] He contends that the testimony actually dispelled the notion that the nurses were negligent. In addition, he argues that Dr. Stark did not articulate the standard of care for nurses as his statement that they "may get a doctor" suggests discretion on their part, not that the failure to do so is a breach of the standard of care. Moreover, Mr. Drusko points out that the court sustained an objection to the question whether a nurse deviates from the standard of care when she fails to address a complaint of

---

[6] Although Appellant ordered transcription of the notes of testimony, and the trial court and parties refer to the transcript, the transcript was omitted from the certified record transmitted to this Court. All counsel were advised by the Prothonotary of Venango County of the contents of the record being transmitted to this Court, and the trial transcript is conspicuously absent from the list. We remind litigants that it is an appellant's duty to ensure that the record is complete prior to transmission of the certified record to this Court. In order to reach the merits, however, we directed Appellant to obtain a copy of the trial notes of testimony and to file it with the Prothonotary of Venango County, and Appellant complied. *See* Pa.R.A.P. 1926. The notes of testimony were transmitted to this Court as a supplemental record.

cardiac pain as it was outside the scope of Dr. Stark's report.[7] N.T. Vol. 1, at 259-60. In short, Mr. Drusko maintains the record lacks the necessary evidentiary foundation for a *prima facie* case of nursing negligence.

Mr. Drusko also asserts that since the defense expert's report circumscribes the scope of his testimony, and none of the pretrial expert reports contained any opinions of nursing negligence, neither side was permitted to advance a claim of negligence against the nursing staff at trial. He characterizes the issue herein as one of first impression: Whether a dismissed defendant can be included on the verdict slip for apportionment purposes where no party has preserved a claim of negligence. He urges this Court to "refine the broader law" to preclude placing a dismissed defendant on the verdict slip unless at least one of the original or remaining defendants has preserved a negligence claim with the type of evidence of negligence required under **Hyrcza** and **Herbert** to establish a *prima facie* case. In other words, unless a **defendant** produced a pre-trial expert report implicating a settling defendant in causing the plaintiff's injuries, the defense should not be permitted to present such evidence of liability. Appellant's brief at 20. Such a rule, according to Plaintiff, would avoid unfair surprise

---

[7] The objection was made to the testimony of Dr. Finley W. Brown, Jr., not the testimony of Dr. Robert Stark.

and provide the plaintiff with sufficient notice to rebut a defendant's evidence of settling defendant's negligence.

Dr. Lovestrand counters that there was more than enough evidence to make out a *prima facie* case of negligence against the Hospital and mandate its inclusion on the verdict slip. Furthermore, he maintains that evidence critical of a settling defendant is enough to warrant its placement on the verdict slip. Finally, according to Dr. Lovestrand, the evidence herein "was sufficient to create a jury issue as to the Hospital's liability even without expert testimony." Appellee's brief at 18. The jury could conclude that the standard of care had been breached based on their common sense and everyday knowledge. *Id*. at 19.

We find first that Mr. Drusko's representation that no party preserved a claim of negligence against the Hospital is not borne out by the record. Dr. Stark furnished several expert reports on behalf of Plaintiff, one of which contained his opinion that the Hospital's emergency room should have ordered an EKG and a cardiology consult and further that Hospital fell below the standard of care when five days elapsed before the original EKG was over read. Expert Reports, Robert Stark M.D., 6/24/10, at 2; 3/26/13, at 3. Dr. Stark opined that the delay was a deviation from the standard of care, and further, that it contributed to Ms. Drusko's death. *Id*. Dr. Finley W. Brown, Jr. was also critical of the Hospital. He opined that Ms. Drusko's post-operative complications were "not properly or aggressively managed

and treated by the general surgery service, primary care service . . . . and she was not seen by a cardiologist and a pulmonologist." Expert Report, Finley W. Brown, Jr., 3/5/10, at 2. Testimony consistent with these reports, if elicited from Dr. Stark and Dr. Brown on cross-examination, would have been sufficient to constitute *prima facie* evidence of negligence against the Hospital.

Where expert testimony is required to make out a *prima facie* case of negligence against a settling defendant, and no expert report was filed implicating that party, we agree that the trial court should dismiss the settling defendant from the lawsuit for purposes of apportionment. However, that was not the case herein. In light of the expert reports of Drs. Stark and Brown that were critical of the Hospital, we find no error or abuse of discretion in the trial court's decision to defer its ruling on whether the Hospital would be placed on the verdict slip until the close of the evidence. Assuming that testimony sufficient to support a *prima facie* negligence case against the settling Hospital was adduced at trial, the Hospital properly would be included on the verdict slip for purposes of apportionment. On the facts herein, we find no error or abuse of discretion on the part of the trial court in that regard.

That said, as the instant trial commenced, none of the reports of the testifying experts contained opinions that the Hospital was liable based on the negligence of the **nurses**. No expert had articulated the relevant

standard of care for the nurses, opined that it had been breached, or that the breach increased the risk of harm to Ms. Drusko. Nonetheless, despite the absence of an expert report critical of the post-operative nursing care, considerable testimony impugning that care was elicited from Drs. Traill, Brown, and Stark.[8] For instance, the defense asked Dr. Brown:

> Q: In any event, if a patient is in the hospital and they're complaining of chest pain, that is certainly something that should be addressed; is it not?
>
> A. Yes.
>
> Q. Because if a patient is complaining of chest pain, that is a sign and symptom that they may have an evolving cardiac event, correct?
>
> A. Yes.
>
> Q. And if a patient is complaining to a nurse of chest pain, that is certainly something the nurse should report to the physician, correct?
>
> A. Yes.
>
> Q. And if the nurse doesn't do that, she deviates from the standard of care; does she not?

_____

[8] Arguably, such testimony was objectionable under Pa.R.C.P. 4003.5(c), which requires the timely disclosure of expert opinion and limits experts to the fair scope of their reports. The rule was designed to prevent a party from ambushing his opponent on the eve of trial with opinions that were not disclosed during discovery and "to prevent incomplete or 'fudging' of expert reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor." *Woodard v. Chatterjee*, 827 A.2d 433, 441 (Pa.Super. 2003).

N.T. Vol.1, at 218-19.  At that point, Plaintiff objected "to this examination" as outside the scope of Dr. Brown's report, and the objection was sustained. The court agreed that the expert's opinion regarding nursing was not in the report.  *Id*. at 220.

Similar questions were directed to Dr. Stark.  Dr. Stark confirmed that when Mrs. Drusko initially went to the emergency room, she was complaining of epigastric pain, and that such pain was often a sign of a heart problem.  He subsequently disputed that the complaints of chest pain two days post-operatively were distinctly different, noting that the nurses recorded reports of epigastric pain that sounded similar to her complaints in the emergency room.  He acknowledged, however, that post-operatively, Mr. Drusko reported complaints of chest pain to the nurses.  *Id*. at 277.

> Q. And you would certainly think, wouldn't you, that if a patient is reporting chest pain to the nurses and if her husband's reporting chest pain to the nurses, and this is going on throughout the day, that the nurses would alert a doctor and pass that complaint along?
>
> A. I would think so, yes.
>
> Q. And you know from studying the record that that didn't happen, correct?
>
> A. Correct.
>
> Q. And you're aware now, aren't you, that throughout the day she was telling Mr. Drusko that she was experiencing chest pain and that both Mr. and Mrs. Drusko were telling the nurses that she was experiencing chest pain?
>
> A. I'm aware of that, yes.

Q. In fact, even though Mr. Drusko says that this complaint was occurring throughout the day, the first indication that any doctor was called was when Dr. Palermo was phoned at 8:30 p.m., correct?

A. Yes.

Q. And do you recall from the record, Dr. Stark, that when Dr. Palermo was called at 8:30, he -- in terms we've used but maybe you've used them different as a physician -- kind of cross –examined the nurse about isn't this or couldn't this be cardiac pain?

A. I saw that, yes.

Q. And in Dr. Palermo's note he indicates that the nurse said very clearly it's not cardiac pain, right?

A. Yes.

N.T. Vol. I, at 277- 278.  Dr. Stark went on to opine that the myocardial infarction likely started that day, although the precise time of onset could not be determined.  Defense counsel then inquired:

Q. Had it been picked up, say, six hours earlier, might it have made a difference?

A. It might have made a difference, yes.

Q. And explain for us why it might have made a difference had it been picked up six hours earlier?

A. Six hours earlier less of her heart muscle had been irreparably damaged so that if they did an angioplasty and brought in fresh flow of new blood, maybe there would be enough heart left for her to survive.

N.T. Vol. 1, at 282-83.

Mr. Drusko now argues that the aforementioned expert testimony fell short of that necessary for establishing a *prima facie* case of liability against the Hospital and precluded it from being listed on the verdict slip. We agree with Mr. Drusko that Dr. Traill's statement that the nurses were "in error" when they attributed Ms. Drusko's complaints to post-operative pain rather than a myocardial infarction was insufficient to establish a *prima facie* case of negligence. Obviously, the nurses were incorrect in their assessment. The issue was whether the nurses' failure to suspect a cardiac issue and alert a physician was a deviation from the nursing standard of care and Dr. Traill's testimony did not address that critical question.

However, the testimony of Dr. Stark and Dr. Brown, although not expressly stated in terms of the standard of care, did supply the nursing standard of care. Dr. Stark testified that he practiced in the hospital with patients and observed what nurses do "all the time." N.T. Vol. 1, at 302.[9] He stated that when a patient complains to nurses of chest pain, nurses "immediately --- and I mean immediately evaluate the patient with vital signs, EKG, and may get a doctor." *Id*. Dr. Stark was asked, couched in hypothetical terms, whether he would think, "if a patient is reporting chest

_____

[9] There was no objection to physicians offering testimony about what nurses should do in response to complaints of chest pain. *See **Rettger v. UPMC Shadyside**, 991 A.2d 915, 929-30 (Pa.Super. 2010) (holding a physician may opine on nursing standards when he has the requisite experience or education with those practices).

pain to the nurses and if her husband's reporting chest pain to the nurses and this is going on throughout the day, that the nurses would alert a doctor and pass the complaint along?" N.T., Vol. 1, at 277-78. He responded, "I would certainly think so, yes." *Id*. After confirming that no physician was alerted in this instance until 8:30 p.m. that evening, he opined that a six-hour delay in diagnosing and treating a myocardial infarction increased the risk of harm as the heart muscle might not have been irreparably damaged if blood flow had been increased sooner. *Id*. at 282-83.

Although an objection was sustained to the question addressed to Dr. Brown whether the nurses' conduct fell below the standard of care, Dr. Brown's testimony up to that point arguably articulated both the standard of care and its breach, assuming that the jury credited Mr. Drusko's factual account of repeated complaints of chest pain rather than the charted epigastric pain.[10] Dr. Stark's testimony regarding what the nurses should have done was even more explicit. He also confirmed that the delay

_____

[10] A portion of Mr. Drusko's April 3, 2013 deposition was read to the jury during the cross-examination of Dr. Stark. In describing what transpired two days after surgery, he stated: "She kept ringing the nurses and saying that the pain was pretty bad in her chest." N.T. Vol.I, at 319. He was asked whether the pain in the chest was different from the pain she had when she presented to the hospital initially, *i.e.*, "Was it in a different area as she was describing to you?" *Id*. He responded "Yes" and pointed to the area that was painful. *Id*. He described the area to which he was pointing as "Base of the neck, top chest." *Id*. Dr. Stark confirmed that the base of the neck, top of the chest area is not the epigastric area and that it could be consistent with cardiac pain. *Id*. at 320.

increased the risk of harm for the decedent and that had the cardiac event been recognized six hours earlier, "it might have made a difference" as an angioplasty could have been performed, which may have prevented the extensive heart damage. N.T, Vol. 1, at 282-83.

The law is well-settled that an expert's opinion need not contain "magic words." *Welsh v. Bulger*, 698 A.2d 581, 585-86 (Pa. 1997). Rather, we look to the substance of the evidence presented. *Id*. at 586; *see also Rauch v. Mike-Mayer*, 783 A.2d 815, 826 (Pa.Super. 2001) (expert report that did not "contain a formulaic incantation of identification and fault attribution" sufficient when its clear import implicated the physician defendants). While this is a close question, viewing the evidence in the light most favorable to the verdict winner as we must, we find that the testimony of Drs. Stark and Brown regarding the appropriate nursing response to a patient's complaints of chest pain, their acknowledgement that the nurses did not follow that protocol, and the effect of the resulting delay, met the *prima facie* evidence requirement of *Hyrcza*. Hence, we find no error in placing the Hospital on the verdict slip for purposes of apportionment.

Mr. Drusko asks us to "refine the broader case law on this issue to disallow the appearance of a settling defendant on a verdict slip unless the specific party who moves for inclusion has preserved a claim consistent with" evidence that would satisfy *Hyrcza* or *Herbert*. Appellant's brief at 20. We decline to do so for several reasons. First, Mr. Drusko did not advance that

- 22 -

position below nor develop it on appeal. Secondly, the evidence herein would satisfy **Herbert**, **supra**. In **Herbert**, **supra**, as in the instant case, we found that the requisite expert opinion that the settling defendant deviated from the standard of care was contained in the expert reports of the plaintiff's medical experts who testified at trial. Finally, Mr. Drusko has not proffered any argument in support of his contention that the settling defendant cannot be included on the verdict slip unless the specific party who moves for inclusion, *i.e.*, the non-settling defendant, preserved the claim. Such a position suggests that a crossclaim for contribution is a prerequisite to retaining settling defendants as parties or including them on the verdict slip for purposes of apportionment, a position we expressly rejected in **Herbert**, **supra**.

Moreover, we agree with the trial court that any alleged error in including the Hospital on the verdict slip was harmless since the jury did not find the Hospital negligent nor apportion liability. Mr. Drusko contends that the inclusion of the Hospital "obviously influenced members of the jury because two jurors voted that UPMC was negligent." Appellant's brief at 25. He maintains further that it is impossible to gauge how those two jurors influenced the jury's ultimate determination that Dr. Lovestrand, although negligent, was not the cause of Ms. Drusko's death. Additionally, Mr. Drusko argues that the trial court's rigid cause and effect harmless error analysis is at odds with our decision in **Deeds v. University of Pennsylvania Med.**

***Ctr.***, 110 A.3d 1009 (Pa.Super. 2015), in which we acknowledged that intangible factors can affect the deliberation process and mandate a new trial. Appellant's brief at 23.

The facts herein merit a different result than our disposition in ***Deeds***. In that case, defense counsel made repeated references to plaintiffs' receipt of governmental benefits and collateral sources of compensation, a flagrant violation of the collateral source rule. Although the trial court sustained objections to the improper and highly prejudicial testimony, it did not issue a curative instruction. This Court found that counsel's comments improperly suggested that the plaintiffs had already been compensated and were not entitled to additional damages, and that the trial judge did not take sufficient steps to cure the prejudicial effect of such evidence. In that instance, we concluded that the defendant's violation of the collateral source rule could have affected the jury's deliberation of liability as well as damages. Since we had little confidence that the jury's verdict finding no negligence "was unaffected by the collateral source evidence and argument[,]" we remanded for a new trial. ***Deeds***, ***supra*** at 1014.

Even if we had concluded that it was improper to include the Hospital on the verdict slip, there is nothing to suggest that it affected the verdict on causation in this case. All twelve jurors unanimously found Dr. Lovestrand negligent, but ten of them concluded that his negligence was not the cause of harm to Ms. Drusko. There is no indication that two jurors' belief that the

Hospital was also negligent had any impact on the jury's conclusion that Dr. Lovestrand's negligence did not cause or increase the risk of Ms. Drusko's death. Moreover, since the inclusion of the Hospital on the verdict slip did not result in any apportionment or reduction in the verdict, we find no prejudice to Mr. Drusko that would warrant a new trial. ***Harman ex rel. Harman v. Borah***, 756 A.2d 1116, 1122 (Pa. 2000).

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/1/2017