J-A26023-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| DARLENE LUTZ AND PAUL LUTZ | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANIEL HECKMAN, M.D., ST. LUKE'S | : | |
| ORTHOPEDIC SPECIALISTS AND ST. | : | |
| LUKE'S HOSPITAL - ALLENTOWN | : | No. 826 EDA 2020 |
| CAMPUS | : | |
| | : | |
| | : | |
| APPEAL OF: DARLENE LUTZ | : | |

Appeal from the Order Entered January 30, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2018-C-0201

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JANUARY 06, 2021**

Darlene Lutz (Lutz) and Paul Lutz (h/w) appeal from the order, entered in the Court of Common Pleas of Lehigh County, granting summary judgment in favor of Defendants-Appellees, Daniel Heckman, M.D., St. Luke's Orthopedic Specialists, and St. Luke's Hospital – Allentown Campus.   After a thorough review of the record on appeal, we are constrained to affirm.

In September 2015, Lutz, a registered emergency room nurse, sustained a work-related injury while trying to move a patient.  As a result of the injury, Dr. Heckman, a board-certified orthopedic surgeon, diagnosed Lutz with a labral tear of her left rotator cuff and suggested surgery to repair the tear.   On February 1, 2016, Dr. Heckman performed a left shoulder

_____

[*] Former Justice specially assigned to the Superior Court.

arthroscopy with subscapularis repair on Lutz at St. Luke's Hospital – Allentown Campus. Prior to the surgery, Lutz signed a "Consent to Procedure or Surgery" form that specifically listed neurovascular injury and persisting pain/stiffness/instability as possible risks or complications from the procedure.

Following surgery, Lutz suffered from pain, dysfunction, and other discomfort.[1] Lutz "sought care with Defendant [Heckman] as well as additional care from other care providers after the surgery."[2] Doctor Heckman's post-surgical plan of care for Lutz consisted of prescription pain relief medication and a course of physical therapy. Plaintiffs' Amended Complaint, 6/21/18, at ¶ 12. In August 2016, Lutz was involved in a motor vehicle accident. As a result of the accident and "increasing and worsening shoulder pain," Deposition of Daniel Scott Heckman, M.D., 10/23/19, at 65, Dr. Heckman ordered a magnetic resonance imaging (MRI) of her left shoulder; the results of the MRI did not show any tears or structural problems. Doctor Heckman told Lutz that he believed her "ongoing pain" was related to subacromial bursitis and offered Lutz an injection due to inflammation in her bursa, but she declined. *Id.* at 70-71. *See also* Progress Notes of Daniel Scott Heckman, M.D., 9/1/16, at 1.

---

[1] In her amended complaint, Lutz alleges she suffered from "pain, coldness, numbness and tingling in her left upper extremity" as a result of the surgery. Plaintiff's Amended Complaint, 6/21/18, at ¶ 19(f).

[2] Lutz last treated with Dr. Heckman at a follow-up appointment in September 2016.

In September 2016, Lutz sought a second opinion from Orthopedic Associates of Allentown, where she saw Gregor Hawk, M.D. Doctor Hawk conducted a physical examination of Lutz and ordered an electromyogram (EMG)/nerve conduction study be performed on her shoulder. Two EMGs were performed on Lutz, on September 22, 2016 and December 13, 2016. The December 13, 2016 EMG revealed that Lutz had significant left axillary nerve[3] partial axonopathy compromise. In June 2017, Lutz was examined by Adam B. Strohl, M.D., of Philadelphia Hand to Shoulder Center, who noted that Lutz had atrophy of the left shoulder, and believed "that she had an injury to her axillary nerve . . . [that] may be from a stretch retraction, suture placement, and/or thermal coagulation or thermal injury." Report of Adam B. Strohl, M.D., of Philadelphia Hand to Shoulder Center, 6/16/17, at 2. Second opinions from various doctors confirmed that the delay in diagnosing Lutz's nerve injury led to "the permanency of her medical condition." Plaintiffs' Amended

---

[3] The axillary nerve is a major peripheral nerve of the upper limb. *See* https://teachmeanatomy.info/upper-limb/nerves/axillary-nerve (last visited on 12/16/20). The nerve arises from the brachial plexus at the level of the axilla at spinal roots C5 and C6. *See* https://www.howtorelief.com/axillary-nerve-course-motor-sensory-common-injuries (last visited on 12/16/20). Common symptoms of axillary nerve dysfunction include: numbness or tingling in the shoulder region; weakness in the shoulders, difficulty lifting arms above the head; and difficulty lifting objects. *See* https://www.healthline.com/health/axillary-nerve-dysfunction#symptoms (last visited on 12/16/20).

Complaint, 6/21/18, at ¶ 14. Lutz continues to suffer from chronic pain and discomfort in her left, upper extremity. *Id.* at ¶ 15.[4]

On January 23, 2018, the Lutzes filed a medical malpractice complaint against Defendants alleging negligence and loss of consortium.[5] On June 21, 2018, Lutz filed an amended complaint adding a fifth count, lack of informed consent[6] (battery).[7] *See* Plaintiffs' Amended Complaint, 6/21/18, at ¶ 35. In

_____

[4] Lutz had three subsequent surgeries in July 2017 (open axillary nerve dissection), November 2017 (open revision biceps tenodesis) and February 2018 (biceps revision).

[5] Lutz alleged that her husband, Paul Lutz, suffered from loss of consortium due to Defendants' negligence.

[6] To the extent that Lutz alleges battery (lack of informed consent) against Defendants St. Luke's Orthopedic Specialists and St. Luke's Hospital – Allentown Campus, we recognize that our Court has held that a medical facility cannot be held vicariously liable for the failure of its physicians to obtain a patient's informed consent. *Valles v. Albert Einstein Med. Ctr.*, 805 A.2d 1232 (Pa. 2002) (battery that results from lack of informed consent is not type of action that occurs within scope of employment for purposes of vicarious liability).

[7] *See* 40 P.S. § 1303.504 (informed consent statute outlining physician's duties in obtaining informed consent of patient, description of procedure and expert testimony required to prove claim). Moreover, in order to show that a patient validly consented to a medical procedure, it must be shown that:

> the physician disclosed all those facts, risks and alternatives that a reasonable [person] in the situation which the physician knew or should have known to be the plaintiff's, would deem significant in making a decision to undergo the recommended treatment. . . . The physician is bound to disclose only those risks which a reasonable [person] would consider material to [the] decision [of] whether or not to undergo treatment.

*Jozsa v. Hottenstein*, 528 A.2d 606, 607 (Pa. Super. 1987) (citation omitted).

- 4 -

the amended complaint, Lutz specifically claimed that Dr. Heckman negligently performed her shoulder surgery, negligently failed to timely diagnose and treat her post-surgical concerns, failed to secure her informed consent, and did not indicate that the outcome of the surgery was a natural risk of the procedure. *Id.* at ¶ 19. Lutz filed suit against Defendants, St. Luke's Orthopedic Specialists and St. Luke's Hospital – Allentown Campus, under the legal theory of vicarious liability. *Id.* at ¶¶ 23, 26. Lutz sought "judgment against Defendants[,] jointly and severally[,] in excess of $50,000.00." *Id.* at 5-7.

On May 7, 2018, Lutz filed a single Pa.R.C.P. 1042.3 certificate of merit[8] with regard to all Defendants.[9] On June 5, 2018, Defendants filed a motion

_____

[8] Rule 1042.3 provides that a certificate of merit must be filed in any action "based upon an allegation that a licensed professional deviated from an acceptable professional standard." Pa.R.C.P. 1042.3(a). In such case, the plaintiff's attorney shall file a signed certificate of merit within sixty days after the filing of the complaint. *Id.* In the certificate, the plaintiff's attorney shall acknowledge that either: "(1) an appropriate licensed professional has supplied a written statement that there is a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, [or] (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, [or] (3) expert testimony of an appropriate licensed professional is unnecessary for the prosecution of the claim." Pa.R.C.P. 1042.3(a)(1-3).

[9] On April 12, 2018, the court granted Lutz's March 22, 2018 unopposed motion for extension of time within which to file the required certificates of merit. The order required Lutz to file her certificates of merit by May 21, 2018, or risk Defendants filing a praecipe for entry of judgment of *non pros*.

to strike Lutz's certificate of merit and enter a judgment of *non pros* claiming that the certificate was inadequate to satisfy the requirements of Rule 1042.3. Specifically, Defendants contended that the physician's written statement supplementing Lutz's certificate was insufficient where George L. Rodriguez, M.D., a board-certified physician in physical medicine and rehabilitation, was not qualified to offer an opinion on Dr. Heckman, an orthopedic surgeon. Moreover, Defendants alleged that the same physician neither offered an opinion regarding the alleged corporate negligence of Defendants St. Luke's Orthopedic Specialists and St. Luke's Hospital, nor was he qualified to do so. Finally, Defendants contended that Lutz's certificate violated Rule 1042.3(b) "by addressing all three [D]efendants in a single certificate." Memorandum Supporting the Motion of Defendants to Strike Plaintiff's Certificate of Merit, 6/5/18, at 4. On July 2, 2018, Lutz filed a separate certificate of merit for each of the Defendants. In support of the certificates, Lutz provided the same letter from Dr. Rodriguez, dated March 21, 2018, which she had used to supplement her May 7, 2018 certificate of merit.[10]

---

[10] In his statement, Dr. Rodriguez opined that "there is a basis to conclude that the care, skill[,] or knowledge exercised by Daniel Heckman, M.D.[,] in the treatment, practice[,] or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in aggravating Darlene Lutz's current medical condition." Written Statement by George L. Rodriguez, M.D., 3/21/18, at 1. He also opined "within a reasonable degree of medical certainty, that as a direct and causal relation to the treatment provided by Dr. Heckman[,] her injuries are now severe and permanent with significant pain and suffering[,] and [] her function is extremely limited as well. It is expected that the conditions resulting from the treatment provided by Dr. Heckman will be permanent." ***Id.***

On August 27, 2018, the court heard argument on Defendants' motion to strike/enter judgment of *non pros*. On September 6, 2018, the court denied Defendants' motion "to the extent that [Lutz] shall be permitted to file, within thirty (30) days of the date of this [o]rder, additional [c]ertificates of [m]erit from an alternate 'appropriate licensed professional' with documentation to support [the] person's qualifications as they relate to orthopedic surgery." Order, 9/6/18.[11]

On October 5, 2018, Lutz filed separate certificates of merit for each Defendant. Attached to those certificates were statements from Norman B. Stempler, D.O, an orthopedic specialist, indicating that after reviewing Lutz's medical records and examining her personally, he believes that "[t]here is a basis to conclude that the skill, care[,] or knowledge exercised or exhibited by [each] Defendant in the treatment, practice[,] or work that is the subject of the complaint, fell outside acceptable professional standards and th[at] such conduct was cause in bringing about the harm." Norman B. Stempler, M.D., Certificate of Qualified Expert, 10/5/18. On June 19, 2019, the trial court

_____

[11] The court specifically found that Dr. Rodriguez did not possess the knowledge and experience to render an opinion regarding the negligent performance of Dr. Heckman's surgery sufficient to waive the "same subspecialty" or "board certification" requirements under 40 P.S. §§ 1303.512(c) or (d) of the Medical Care Availability and Reduction of Error (MCARE) Act. Trial Court Opinion, 9/6/18, at 8. While the court noted that Dr. Rodriguez may be qualified to render an opinion regarding allegedly negligent after-care and pain management following Lutz's surgery, *id.*, Lutz never supplemented Dr. Rodriguez's report with one opining that Dr. Heckman's post-surgical care deviated from acceptable medical standards. At most, his March 2018 report opines on the issue of causation, not breach of duty as a result of deviating from medical standards.

entered a case management order requiring Lutz to "identify and submit to all other parties . . . [the] expert reports of all expert witnesses intended to testify no later than November 1, 2019." Order, 6/19/19, at ¶ 2.

On November 27, 2019, Defendants filed a motion for summary judgment claiming that Lutz had yet failed to "produce any [expert] report that sets for[th] the standard of care, an alleged deviation, or causation of any damages, as it relates to the care rendered by Dr. Heckman." Defendants' Memorandum of Law in Support of Motion for Summary Judgment, 11/27/19, at 3. Lutz filed a response to the motion on December 23, 2019, attaching two expert reports—one from G. Russell Huffman, M.D., and one from Dr. Stempler—and office notes from Lutz's treating physician, Adam B. Strohl, M.D.[12] On January 29, 2020, the trial court held argument on the motion. On January 30, 2020, the court entered an order granting summary judgment in favor of Defendants and against Lutz.

Lutz filed a motion for reconsideration on February 12, 2020, and an amended motion[13] the following day, attaching supplemental reports from

---

[12] In July 2017, Dr. Strohl performed a follow-up surgical procedure on Lutz, a neurolysis of the axillary nerve, to relieve her left shoulder pain and dysfunction.

[13] The court notes the only discernable difference between Lutz's motion for reconsideration and her amended motion for reconsideration are four additional exhibits.

Drs. Stempler[14] and Rodriguez, and new reports from Drs. Kenneth Kearns and Dennis McHugh. On February 26, 2020, the court dismissed Lutz's motion as moot and denied her amended motion. Lutz filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Lutz presents the following issues for our consideration:

(1)     Whether the [t]rial [c]ourt erred in entering summary judgment against [] Lutz.

(2)     Whether the [t]rial [c]ourt erred [in concluding] that there is no material issue of fact as to whether the Appellees/Defendants, Daniel Heckman, M.D.[,] St. Luke's Orthopedic Specialists and St. Luke's Hospital Allentown Campus[,] negligently treated [] Lutz's shoulder injury, by failing to exercise reasonable care in the performance of the surgery or negligently failed to diagnose and treat an axillary nerve injury following the surgery.

(3)     Whether the trial court erred in finding that [Lutz] failed to proffer [an] expert opinion in support of her medical malpractice claims.

Appellant's Brief, at 7.

The majority of Lutz's issues boil down to one central question: Whether the trial court erred in granting summary judgment when it determined that there were no issues of material fact because Lutz failed to provide expert opinion to support her medical malpractice claims.

---

[14] In fact, Dr. Stempler's supplemental report, dated February 4, 2020, states that, "It is my opinion that the injury [sustained at Lutz's place of employment] resulted in the surgery which was necessary and in my opinion did **not** fall below the standard of care." Supplemental Expert Report of Norman B. Stempler, D.O., 4/4/20, at 1 (emphasis added).

Initially we note that:

> [S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

> An order granting summary judgment will be reversed if the trial court committed an error of law or abused its discretion. The decision relating to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. It is settled that, [i]f there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Malanchuk v. Sivchuk*, 148 A.3d 860, 865-66 (Pa. Super. 2016) (en banc) (internal citations and quotation marks omitted).

"Because medical malpractice is a form of negligence, to state a *prima facie* cause of action, a plaintiff must demonstrate the following elements of negligence: [(1)] a duty owed by the physician to the patient[; (2)] a breach of that duty by the physician[; (3)] that the breach was the proximate cause of the harm suffered[;] and [(4) that] the damages suffered were a direct result of [the] harm." *Fessenden v. Robert Packer Hosp.*, 97 A.3d 1225, 1229 (Pa. Super. 2014) (internal citations omitted). "With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the

elements of duty, breach, and causation." ***Id.*** Expert testimony is also required where allegations of corporate liability are involved, unless the hospital's negligence is obvious. ***Grossman v. Barke***, 866 A.2d 561, 567 (Pa. Super. 2005).

"[T]he need for expert testimony in a medical malpractice claim will rest upon the facts and averments of the individual case." ***Ditch v. Waynesboro Hosp.***, 917 A.2d 317, 323 (Pa. Super. 2007), *aff'd*, 17 A.3d 310 (Pa. 2011). "[I]f, at the conclusion of discovery, the plaintiff fails to produce expert medical opinion addressing the elements of his cause of action within a reasonable degree of medical certainty, he has failed to establish a *prima facie* case and may not proceed to trial." ***Miller v. Sacred Heart Hosp.***, 753 A.2d 829, 833 (Pa. Super. 2000); ***see*** Pa.R.C.P. 1035.2(2). ***Rauch v. Mike-Mayer***, 783 A.2d 815, 823-24 (Pa. Super. 2001) (court may properly grant summary judgment where evidentiary record contains insufficient evidence of facts to make out *prima facie* cause of action or defense). As is the situation in the present case, under Rule 1035.2(2), "if a defendant is a moving party, he may make the showing necessary to support the [entry] of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of his cause of action." ***Id.*** at 824.

At argument on the summary judgment motion, Lutz's attorney stated that causation had, in fact, been addressed in both Dr. Stempler's and Dr. Huffman's expert reports. Specifically, Lutz's counsel claimed that in Dr. Stempler's June 15th report, he opined that "[Dr. Heckman] perforated [Lutz's]

capsule and damaged the axillary nerve twisting it and resulting in severe, disabling pain." N.T. Summary Judgment Hearing, 1/29/20, at 2. Moreover, counsel noted, "When you look at that statement by Dr. Stempler[,] as well as the [c]ertificate of [m]erit where he indicates that Dr. Heckman's treatment and surgery of [Lutz] fell below the accepted professional standard of care, that is sufficient to establish causation **as to the surgery portion** of this, Your Honor." *Id.* (emphasis added). Lutz's attorney also stated that Dr. Huffman's report indicated that Lutz's diagnosis of axillary nerve damage from the surgery was delayed by Dr. Heckman. *Id.* at 5-6. Finally, counsel stated that the "causation part of this" does not have to be addressed by expert opinion where the jury could make the determination that there was causation based on the nerve study, treating physician's testimony, and Lutz's own testimony that she had complained to Dr. Heckman numerous times about the post-surgical pain and he did not order any test to reveal her injury. *Id.* at 6.

In contrast, defense counsel pointed out that Lutz's expert reports did not discuss the lack of informed consent claim she made against Defendants. *Id.* at 7. Moreover, Defendants argued that nowhere in their reports did Lutz's experts state what the standard of care was in performing her shoulder procedure. *Id.* at 8. *See* Expert Report of Norman B. Stempler, D.O., 6/15/18, at 4 ("In my opinion, . . . the patient suffered . . . multiple complications from left shoulder arthroscopic surgery" and as a result "remains totally and permanently disabled form her pervious employment as

an emergency room nurse."); IME of G. Russel Huffman, M.D., 5/28/19, at 11 ("[Lutz] underwent surgery, which by all records and accounts appeared to be complicated by an axillary nerve injury. The axillary nerve injury diagnosis was delayed [and s]he has had multiple surgeries after that to do a neurolysis of the axillary nerve, revision biceps tendinosis[,] and revision subscapularis repairs."); Office Notes of Norman B. Stempler, D.O., 6/15/18, at 2 ("As a result of the complication of [a surgical arthroscopy of the left shoulder], the surgeon perforated [Lutz's] capsule and damaged the axillary nerve twisting it and resulting ins severe, disabling pain."); *Id.* at 4 ("In my opinion, the patient suffered an internal derangement of the left shoulder and underwent arthroscopic surgery with multiple complications requiring three, possibly four, additional surgeries, none of which are going to return her to full functional activity.").

At the conclusion of the summary judgment hearing, the trial judge stated:

> Admittedly, when I read the [expert] reports, the causation was lacking. I mean, it just stuck out. It just read like a different sort of expert report. It was more a review of [Lutz's] records and the outcome as opposed to the expert testimony required in a medical malpractice that failure to do X results in Z.

N.T. Summary Judgment Hearing, 1/29/20, at 18-19. We agree.

Both parties cite to *Rauch*, *supra*, to support their positions on appeal. In that case, the patient (decedent) fell, injuring her elbow. *Id.* at 818. One of the defendant-doctors scheduled decedent for corrective surgery despite the known fact that she had an extensive past medical history, including

hypertension, diabetes, two myocardial infarctions with quadruple bypass surgery, and a cerebrovascular accident affecting her left side. *Id.* In addition, decedent was on several medications, and smoked an average of one pack of cigarettes per day. *Id.* at 818-19. Pre-operative studies suggested the possibility that the decedent had ischemic heart disease and edema (which can be caused by congestive heart failure). *Id.* at 819. Finally, prior to surgery, decedent occasionally complained of chest pain. *Id.* Decedent was classified as "a patient with rather severe systemic disturbance of pathology." *Id.*

After consulting with an anesthesiologist, decedent decided to have general anesthesia administered to her for her elbow surgery. Within minutes of completing the surgery, decedent was placed on a 100 percent oxygen non-breathing mask and her blood pressure registered at 230/120. One-half hour following surgery, decedent "was giving inappropriate responses" to nurses, "biting down on the suction device and . . . coughing up thick mucous." *Id.* One hour and ten minutes after surgery, decedent was intubated. *Id.* Two hours following surgery, a chest x-ray revealed that decedent had pulmonary edema and "vascular interstitial alveolar lung water accumulation." *Id.* Computed tomography (CT) scans later revealed that decedent had suffered a stroke; decedent died due to complications from that stroke nine days after surgery. *Id.*

Decedent's representatives filed a medical malpractice complaint against the decedent's surgeon, anesthesiologists, anesthesia group, the

regional health system, and the regional hospital that was the site of the surgery. The complaint alleged negligence, corporate negligence, and vicarious liability against the hospital. Following the completion of discovery, including the production of expert reports, the defendants filed motions for summary judgment alleging that the expert reports provided an insufficient basis upon which to predicate a *prima facie* case and that plaintiff's experts were not qualified to give such opinions. *Id.* at 820. The trial court granted summary judgment and dismissed all claims against defendants. *Id.*

On appeal, our Court reversed the trial court's order granting summary judgment in favor of defendants, finding that the plaintiff had provided sufficient expert reports that "stat[ed] the acts of the [defendant] physicians deviated from good and acceptable medical standards and that the deviation was the proximate cause of the harm suffered [by the decedent]." *Id.* at 826. Factually, the experts opined that the decedent "died of a stroke that was caused by the [elbow] surgery and [general] anesthesia" administered during the surgery. *Id.* Specifically, one expert opined that due to decedent's severe pre-existing medical conditions, she was not a candidate for general anesthesia in an operation that merely pertained to her elbow, and that the physicians responsible for recommending general anesthesia and administering it to decedent "acted *in reckless disregard* of her welfare." *Id.* (emphasis added). Another expert opined that the decedent was high-risk, that regional anesthesia was another surgical alternative, and that decedent had the option to forego the surgery. *Id.* Coupling together expert reports,

the Court found that plaintiff had provided "adequate expert opinion to make out a *prima facie* case of medical malpractice against all physician defendants." ***Id.***

The content of Lutz's expert reports are qualitatively different than those in ***Rauch***. Critically, the reports in the current case lack the opinions necessary to establish a *prima facie* case of medical malpractice against Dr. Heckman and the remaining defendants. Here, Lutz's experts opine that: (1) Dr. Heckman's shoulder surgery caused Lutz's axillary nerve damage; (2) there was a delay in diagnosing Lutz's post-surgical nerve damage; and (3) due to the delay in diagnosing the nerve damage, Lutz suffers from irreversible, permanent nerve damage. Even taking together all of the expert opinions proffered by Lutz, we have no professional opinion regarding **whether Dr. Heckman's failure to timely diagnose Lutz's axillary nerve damage deviated from acceptable medical standards that proximately caused her injury**. *Cf. **Vicario v. Spiegel***, 936 A.2d 503, 511-12 (Pa. Super. 2007) (non-suit in favor of defendants reversed on appeal where plaintiff's expert's testimony showed steadfast opinion, based on facts of record, including risk factors for metastases, that patient should have "absolutely" been referred to medical oncologist and that failure to do so "deprived" her of "significant opportunity for treatment which significantly increased" risk of harm); ***Cardoza v. Greenbaum***, 866 A.2d 369 (Pa. Super. 2004) (where plaintiff's experts presented testimony of failure to detect cancer **in timely fashion** and such failure increased risk that plaintiff would have

either shortened life expectancy or suffered harm, judgment affirmed in favor of plaintiff who alleged negligence with regard to misreading and misinterpretation of her mammograms over three-year period; only **after** plaintiff has presented such expert testimony is it question for jury to determine whether, by preponderance of evidence, physician's acts or omissions were substantial factor in bringing about harm).

Lutz's omission is critical in light of the fact that Dr. Heckman testified in his deposition that he felt Lutz's complaints were part of the normal post-operative healing process and that her pain was improving right before she suffered a car accident six months following surgery in August 2016. **See** Deposition of Daniel Heckman, M.D., 10/23/19, at 41, 54, 63; **see also id.** at 20 (Doctor Heckman stating 4-5 days post-op, Lutz's complaint of shoulder pain was "[n]othing that seemed outside of what you would expect"); **id.** at 21-22 (Doctor Heckman stating it is normal to have temporary tingling in fingers following shoulder surgery); **id.** at 31-32 (Doctor Heckman "didn't think [one-month post-surgical complaints of spasms, continued pain and axillary swelling, were] too far out of expected findings"); **id.** at 32 (Doctor Heckman speculated Lutz's pain may have been attributable to a lymph node or "just tenderness at the surgical site"); **id.** at 37-38 (Doctor Heckman stated that two-month post-operative pain and axillary swelling "seemed to fit within an expected range for the post-op period"); **id.** at 39-40 (Doctor Heckman stated any loss of deltoid function or atrophy for Lutz two months after surgery was "not . . . beyond the expected post-op time"); **id.** at 41-42 (Doctor

Heckman stated that **at no point during post-op period** did he think Lutz's recovery process was abnormal or anything "that seemed out of the ordinary") (emphasis added); *id.* at 45 (Doctor Heckman noting that he believed there had been some progress in Lutz's range of motion at two-month follow-up appointment); *id.* at 48-49 (Doctor Heckman stating that at three-month follow-up appointment, he "didn't have a high suspicion for a specific nerve injury at [that] point" and did not think an EMG was necessary at that time because Lutz's numbness and tingling were not focused and because she had deltoid function); *id.* at 53-54 (at four-month and five-month follow-up appointments, Doctor Heckman believed Lutz seemed to be getting slightly better, "it seemed like her pain was becoming less and her range of motion was improving" and her axillary swelling had improved); *id.* (Dr. Heckman stated, "I don't believe Lutz's [axillary swelling] was a main concern" four to five months following surgery); *id.* at 62-63 (Doctor Heckman stated that at four- and five-month follow-up appointments, Lutz's motion was improving, pain was decreasing and, although pain "wasn't resolved," doctor thought "[it] seemed to be improving and on the right track."); *id.* at 52-53 (doctor stated that it was possible Lutz's motor vehicle accident six months after surgery contributed to or exacerbated Lutz's injuries); *id.* at 54, 56 (after car accident, six months following surgery, Doctor Heckman testified Lutz "had a setback and had worsening of her symptoms" and "had more pain"); *id.* at 58 (Doctor Heckman stated he "never saw any atrophy that was outside of an expected amount for a post-op period"); and *id.* at 55-56 (Doctor Heckman stated

follow-up MRI six months after surgery showed structure repairs from surgery were healed).

Moreover, Dr. Stempler's blanket statement in his certificate of merit opining that, "[t]here is a basis to conclude that the care, skill[,] or knowledge exercised or exhibited by the Defendant in the treatment, practice[,] or work that is the subject of the complaint, fell outside acceptable professional standards and the such conduct was a cause in bringing about the harm,"[15] is similarly insufficient "evidence of facts to make out a *prima facie* cause" of Dr. Heckman's negligence in the delay of diagnosing Lutz's nerve injury. ***Rauch***, ***supra***. A certificate of merit is merely a filing certifying that an expert report can be produced in a medical malpractice action; the certificate does not supplant the ultimate expert report. ***See Womer v. Hilliker***, 908 A.2d 269, 275 (Pa. 2006) (a purpose of certificate of merit is to signal to parties and trial court that plaintiff "is in a position **to support the allegations** he has made in his professional liability action.") (emphasis added). Specifically, Dr. Stempler's generic statement does not opine, to a reasonable degree of medical certainty, that the six-month delay in diagnosing the nerve injury, as a result of Heckman's post-operative treatment, was either a breach of his duty or a proximate cause of Lutz's permanent nerve damage. ***Id.*** Succinctly stated, it leaves unanswered the vital questions as to whether Dr. Heckman's post-surgical care increased Lutz's risk of harm or Lutz's post-surgical complaints of pain were part of the normal post-operative healing process.

_____

[15] Norman B. Stempler, M.D., Certificate of Qualified Expert, 10/5/18.

In addition to Dr. Stempler, none of Lutz's medical experts opined, within a reasonable degree of medical certainty, with regard to: (1) the standard of care for left arthroscopy surgery or how Dr. Heckman breached the duty he owed to Lutz; (2) the standard of care for diagnosis and treatment of an axillary nerve injury or how Dr. Heckman violated that standard of care; (3) the purported lack of informed consent and battery alleged by Lutz; and (4) what medical testing or treatment should have been provided to Lutz or when that testing or treatment should have been offered. Trial Court Order, 1/30/20, at 1-3 n.1. *See Catlin v. Hamburg*, 56 A.3d 914, 920 (Pa. Super. 2012) (when alleging medical malpractice, determining whether there was breach of duty requires determination of relevant standard of care and whether defendant's conduct met that standard). As Defendants point out, the mere happening of a surgical complication does not automatically equate to a physician's negligence in performing the surgery. *See Mitchell v. Shikora*, 209 A.3d 307, 315 (Pa. 2019) ("[T]here is no 'presumption or inference of negligence merely because a medical procedure terminated in an unfortunate result which might have occurred despite the exercise of reasonable care.'") (citation omitted).

Moreover, it is well established that in a medical battery action, the burden is on the plaintiff to prove that the operation performed was not authorized by him or her. *Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Therefore, Lutz had to prove that Dr. Heckman's contact

exceeded the scope of consent that she gave him.[16]  Finally, expert testimony

is generally required where the subject matter is beyond the knowledge of the

average layperson—such as in a case where a patient alleges lack of informed

consent for a shoulder arthroscopy.  *Id.*  In the present case, Lutz presents

nothing in her expert reports regarding a lack of informed consent or battery,

let alone an opinion stating that a reasonable person would want to know if

an injury consistent with axillary nerve damage may occur before deciding to

have shoulder arthroscopy surgery.  *See **Nogowski v. Alemo-Hammad***,

691 A.2d 950 (Pa. Super. 1997).  Thus, Lutz's expert reports did not meet the

threshold to overcome summary judgment on this claim as well.  ***Festa v.***

***Greenberg***, 511 A.3d 1271, 1277 (Pa. Super. 1986) (in informed consent

case, expert testimony required to establish existence of risks in particular

medical procedure, existence of alternative procedures, and feasibility of these

alternatives in patient's case).[17]

---

[16] As previously noted, prior to surgery Lutz signed a "Consent to Procedure or Surgery" form that specifically listed neurovascular injury and persisting pain/stiffness/instability as possible risks or complications from the procedure. ***See supra***, at 2.

[17] A review of Dr. Strohl's office notes indicates they are nothing more than a summary of his physical examination findings, a discussion of Lutz's pain and shoulder dysfunction, and a recommendation regarding her medical options. The report provides no medical opinion regarding Dr. Heckman's performance of the shoulder arthroscopy surgery and whether his actions fell below the acceptable standard of care.  Notably, Dr. Strohl's notes indicate that it is his belief that "she had an injury to her axillary nerve[,]" but that this injury could be a result of "a stretch retraction, suture placement, and/or thermal coagulation or thermal injury."  Expert Report of Dr. Adam B. Strohl, M.D., 6/16/17, at 2.

To the extent that Lutz has preserved a claim regarding the trial court's refusal to permit her to supplement her expert reports, we find no merit to the issue.[18] At the conclusion of the parties' summary judgment hearing, Lutz asked for an extension within which "to allow Dr. Stempler to submit a supplemental [expert] report" if the court were inclined to grant Defendants' summary judgment motion. N.T. Summary Judgment Hearing, 1/29/20, at 16. The court denied the motion in its order granting summary judgment, noting that Lutz had plenty of opportunities to supplement her expert reports, but chose not to do so.[19] *See* Pa.R.C.P. 1035.3(a), (b) (adverse party must file response within 30 days after service of motion and any adverse party may supplement record at that time).

Here, Defendants filed their summary judgment motion on November 27, 2019, after both the discovery deadline and Lutz's expert report deadline had passed. Moreover, the court did not hold argument on Defendants' motion until January 29, 2020—more than 60 days *after* Defendants filed their motion. Lutz attached Drs. Huffman's and Stempler's expert reports and Dr. Strohl's office notes, dated May 2019, June 2018, and June 2017, respectively,

---

[18] Lutz's issues in her Rule 1925(b) statement and those listed in the "Questions Presented" section of her appellate brief do not perfectly align with those argued in the "Argument" section of her brief.

[19] In addition to being given extra time to supplement her expert reports, the court granted Lutz's motion for an extension of time and gave her an extra 30 days to file additional certificates of merit from an appropriate licensed professional, rather than grant Defendants' motion to strike her certificate or enter a judgment of *non pros*.

to her response to Defendants' summary judgment motion. She did not attempt to supplement the record with any **new** expert reports or supplement those existing reports in that 60-day window, let alone the 30-day time period set forth in Rule 1035.32. In fact, it was not until she filed her amended motion for reconsideration, more than two-and-a-half months after Defendants filed their summary judgment motion and two weeks after the court granted summary judgment, that Lutz filed any **new** reports. Under such facts, we find no abuse of discretion in the court's ruling. **See Kelly v. Siuma**, 34 A.3d 86 (Pa. Super. 2011) (finding trial court properly refused to consider appellant's three new affidavits presented for first time in motion for reconsideration); **see also Rabatin v. Allied Glove Corp.**, 24 A.3d 388 (Pa. Super. 2011) (issues raised for first time in motion for reconsideration after entry of summary judgment may not be considered by this Court).

In conclusion, we recognize that while "there is no need for expert reports to contain a formulaic incantation of identification and fault attribution so long as the clear import of the reports implicates the named physician defendants," **Rauch**, **supra**, here, Lutz failed to produce any expert medical opinion addressing the elements of her cause of action, within a reasonable degree of medical certainty. Accordingly, "[s]he has failed to establish a *prima facie* case and may not proceed to trial." **Miller**, **supra** at 833; **see Gartland v. Rosenthal,** 850 A.2d 671, 677 (Pa. Super. 2004) ("An expert's failure to express an opinion with the requisite certainty makes summary judgment proper. Although the expert need not use special language, with expert

medical testimony, the expert **must** state an opinion within a reasonable degree of medical certainty.") (emphasis added). Thus, the trial court properly granted summary judgment in Defendants' favor. *See* Pa.R.C.P. 1035.2.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date:* <u>1/6/2021</u>